1                    UNITED STATES DISTRICT COURT

2                  SOUTHERN DISTRICT OF CALIFORNIA

3

4   UNITED STATES OF AMERICA,      ) Case No. 10CR2107-WQH
                                   )
5            Plaintiff,            ) San Diego, California
                                   )
6   vs.                            ) Wednesday,
                                   ) June 2, 2010
7   ELIZABETH A. DRAGON,           ) 9:00 a.m.
                                   )
8            Defendant.            )
                                   )
9   _____)

10   TRANSCRIPT OF INITIAL APPEARANCE AND CHANGE OF PLEA HEARING
             BEFORE THE HONORABLE BARBARA LYNN MAJOR
11               UNITED STATES MAGISTRATE JUDGE

12  APPEARANCES:

13  For the Plaintiff:          STEVEN STONE, ESQ.
                                ERIC BESTE, ESQ.
14                              Assistant United States
                                  Attorney
15                              880 Front Street
                                San Diego, California 92101
16
    For the Defendant:          ROMAN E. DARMER, ESQ.
17                              Howrey, LLP
                                Four Park Plaza, Suite 1700
18                              Irvine, California 92614
                                (949) 721-6900
19
    Transcript Ordered by:      STEVEN STONE, ESQ.
20
    Transcriber:                L. L. Francisco
21                              Echo Reporting, Inc.
                                6336 Greenwich Drive, Suite B
22                              San Diego, California 92122
                                (858) 453-7590
23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

1

1    SAN DIEGO, CALIFORNIA, WEDNESDAY, JUNE 2, 2010  9:00 AM

2                          --oOo--

3        (Call to order of the Court.)

4             THE CLERK:  10CR2107-WQH, USA versus Elizabeth A.

5    Dragon.

6             MR. STONE:  Good morning, your Honor, Steven Stone

7    and Eric Beste on behalf of the United States.

8             MR. BESTE:  Good morning.

9             THE COURT:  Great, thank you.

10            MR. DARMER:  Good morning, your Honor, Roman

11   Darmer, Howrey, LLP for Elizabeth A. Dragon who is present

12   in the courtroom.

13            THE COURT:  All right, thank you.  It's my

14   understanding that this is her initial appearance.  And that

15   then she wants to plead guilty.  Is that correct, sir?

16            MR. DARMER:  Yes.

17            THE COURT:  Ma'am, because this is your initial

18   appearance, we have to go through a number of things with

19   you before we reach the guilty plea stage.

20            So, first, I want you -- Do you have a waiver?

21   There it is never mind.  So, first, I want to tell you --

22   let's start with the beginnings.  You have an absolute right

23   obviously to have an attorney help you in defending against

24   these charges.  If you do not have the ability to hire a

25   lawyer, I would appoint a lawyer for you.  It's my

2

1  understanding that you have retained Mr. Darmer to represent

2  you in this matter, is that correct?

3          THE DEFENDANT:  Yes.

4          THE COURT:  And are you making a general

5  appearance at this time, sir?

6          MR. DARMER:  Yes.

7          THE COURT:  Okay, great.

8          Then we'll move on to the next issue and that is

9  the charging document.  You have the right to require the

10 United States to present this case to the grand jury.  And

11 to see whether or not the grand jury would return an

12 indictment charging you with one or more crimes.  By giving

13 up that right, and authorizing the United States to file

14 this information charging you with conspiracy to commit

15 securities fraud, the United States may proceed all the way

16 to trial on that crime without ever presenting this case to

17 the grand jury.  Do you understand all of that?

18         THE DEFENDANT:  Yes.

19         THE COURT:  I have in front of me a two-page

20 consent document -- wait, that's the wrong one.  I need the

21 waiver.  there's the waiver.  I have in front of me a one-

22 page waiver of indictment in which you do give up that right

23 and authorize the United States to file this information.

24 I'm showing you the document.  There are two signatures.  Is

25 the top one yours?

3

1          THE DEFENDANT:  Yes.

2          THE COURT:  Before you signed this document, did

3  you have enough time to discuss it with your lawyer?

4          THE DEFENDANT:  Yes.

5          THE COURT:  By signing this document, and by what

6  you're saying to me in here in court today, you are giving

7  up your right to require the United States to present this

8  case to the grand jury.  And you're authorizing them to

9  charge you with the crime of conspiracy to commit securities

10 fraud.  Is that what you want to do?

11         THE DEFENDANT:  Yes.

12         THE COURT:  I accept your waiver of indictment and

13 I order that the information be filed.

14         Now I want you to listen carefully to my courtroom

15 deputy because you're going to be arraigned on this charge.

16         THE CLERK:  Elizabeth A. Dragon, is that your true

17 name, ma'am?

18         THE DEFENDANT:  Yes.

19         THE CLERK:  You are hereby informed that an

20 information has been filed charging you with conspiracy to

21 commit securities fraud.  Counsel, have you received a copy

22 and do you waive further reading?

23         MR. DARMER:  Yes.

24         THE CLERK:  You are further informed that you are

25 entitled to a trial by jury, to be represented by counsel at

4

1   all stages of the proceedings before this Court, and to have

2   witnesses summoned to testify on your own behalf.  How do

3   you plead to the charges against you, guilty or not guilty?

4           THE DEFENDANT:  Guilty.

5           THE COURT:  For right now we'll enter a not guilty

6   plea.  We'll get to that in a second.  So a not guilty plea

7   will be entered for right now.

8           The next issue that we need to address then is

9   bail.  Have the parties discussed this?

10          MR. STONE:  We have, your Honor.  We haven't

11  reached an agreement on bail.

12          THE COURT:  Have not?

13          MR. STONE:  We have not.  However, neither party

14  is going to be recommending that sureties be involved or

15  property be involved.  The Government is going to recommend

16  that -- a bond.

17          THE COURT:  Why don't we go ahead and do that

18  then.  Ma'am, I want you to listen carefully because this is

19  discussing the bail.  What's the United States position?

20          MR. STONE:  Your Honor, the Government would

21  recommend a $50,000 personal appearance bond secured by the

22  Defendant's own signature.  We believe that it is warranted

23  based on the potential sentence she might be facing.

24          THE COURT:  Which is?

25          MR. STONE:  Which is 25 years in prison.

5

1          THE COURT:  That's the maximum?

2          MR. STONE:  That's the statutory maximum.

3          THE COURT:  What's the guideline range?  Do you

4   know the loss?

5          MR. STONE:  In this case, your Honor, it's a

6   little more complicated because there's no agreement as to

7   loss.  The loss could  be more than 400,000,000 or it could

8   be a lot less.  The Defendant has the right to argue for

9   whatever loss that she would like.  So based on that, it

10  could be very high in terms of her potential sentence or it

11  could be much lower.  But, based on the fact she voluntarily

12  appeared today, in the proposed plea agreement she's agreed

13  to cooperate.  We believe that a bond secured by her own

14  signature would be appropriate.

15         THE COURT:  Does she have any prior convictions?

16         MR. STONE:  No, your Honor.  Your Honor, the only

17  other thing too, the Government asked for her to surrender

18  her passport.  And one of the differences we have with

19  defense counsel is whether she reports to pretrial services.

20  We believe that would be appropriate for her to report to

21  pretrial services.  How often, we would defer to pretrial

22  services.

23         THE COURT:  All right.  And your position, sir?

24         MR. DARMER:  Your Honor, our position is that

25  Doctor Dragon should be released on her own recognizance.

6

1   She is a lifetime -- obviously a United States citizen.

2   Lifetime resident of this country.  Has been a resident of

3   California since 1998.  Resident of San Diego since 2006.

4   She has owned property in San Diego since 2006.  And since

5   1999 when she no longer was employed by her employer in San

6   Diego, is living in Arizona in a home owned by her with her

7   son, her daughter-in-law and her grandchildren.  She

8   undertakes partial responsibility for her grandchildren.

9   She has an unblemished record, no criminal record, a full

10   record of employment throughout her life.  In addition, as

11   the Government indicated, this is a cooperation situation.

12   She's appeared at every meeting that she's requested to go

13   to.  She's appeared at my offices, which are located in

14   Irvine, California, as requested.  As indicated by her

15   passport, even during the pendency of the investigation and

16   with full knowledge of the possible charges against her, she

17   has traveled but always returned to this country and always

18   appeared as required.  We respectfully submit that given all

19   of those factors and the strong ties to the community, that

20   ROR is appropriate.

21         THE COURT:  All right.  I am going to set a

22   monetary bond.  I feel that's appropriate in this case given

23   the seriousness of the allegations that have been filed.  I

24   recognize and accept what the defense counsel has said

25   regarding Defendant's cooperation and her travel and

7

1 returning to the United States.  However, once an actual

2 charging document has been filed it does change things.  And

3 I feel it would be appropriate to require some sort of bond.

4 I don't believe the Defendant will have any -- anyhow, I am

5 going to set a bond.  I'm not going to require a surety.

6 Neither side has requested it.  Given the information

7 presented to me I don't feel it's necessary.  However, I am

8 going to require you to report to pretrial services.  I do

9 think that's important and I am going to require that.  Do

10 you have a need to travel outside of the United States?  You

11 can answer that, sir.

12        THE DEFENDANT:  No, it was vacation.

13        THE COURT:  So what I'm going to do then is, I

14 will require you to surrender your passport to pretrial

15 services.  They retain that.  If something comes up and you

16 need to travel outside of the United States, you may request

17 that through pretrial services.  And I give them the

18 authority to approve or deny that depending on the

19 situation.  If they deny it and you believe it's denied

20 inappropriately, that can be brought back in front of me.

21 All right, sir?

22        MR. DARMER:  Yes.

23        THE COURT:  Okay, ma'am, I want you to listen very

24 carefully because I am setting these conditions and you must

25 comply with all of them.  You must not commit a federal,

8

1   state or local crime during the period of release.  You must

2   make all of your court appearances.  Your travel is

3   restricted to the State of California and the State of

4   Arizona, and you may not enter Mexico.  You must report for

5   supervision to the Pretrial Services Agency as directed by

6   the assigned pretrial services officer, and pay for the

7   reasonable cost of supervision in an amount to be determined

8   by the Pretrial Services Agency and approved by the Court.

9   You may not possess or use any narcotic drug or controlled

10  substance without a lawful medical prescription.  You may

11  not possess any firearm, dangerous weapon, or destructive

12  device during the pendency of the case.  You must read, or

13  have explained to you, and acknowledged understanding of the

14  Advice of Penalties and Sanctions Form.  You must provide a

15  current residence, address and telephone number prior to

16  your release from custody, and keep it current while the

17  case is pending.  You must actively seek and maintain full

18  time employment, schooling, or a combination thereof.  Let

19  me talk about those conditions.  If you're watching your

20  child, that counts as employment.  I don't care whether

21  you're paid.  What I want you to do is to be doing something

22  with your time.  If you volunteer, that also counts.  As

23  I've said, what I want -- I want you occupying yourself

24  during the working day with something.  Are you currently

25  working?

9

1          THE DEFENDANT:  I'm retired.  But, I have four

2  grandchildren that live with me.

3          THE COURT:  Perfect.  Take care of them.  That

4  counts.  And you must execute a personal appearance bond in

5  the amount of $30,000 that's secured by your signature.  Do

6  you understand, ma'am, that if you are released -- you're

7  not going into custody -- but do you understand that you

8  must comply with all of these conditions?

9          THE DEFENDANT:  Yes.

10          THE COURT:  And you are required to go downstairs

11  today at the conclusion of this proceeding and you will have

12  to be booked in.  You are not going to be taken into

13  custody, but you do have to be booked in.  And they'll take

14  your fingerprints and photograph of you and do whatever else

15  they need to do.  Your lawyer is shaking his head.  He knows

16  what to do.

17          And you'll have to sign the necessary documents.

18  And I don't see any reason that can't be done today.

19  Counsel, do you agree?

20          MR. DARMER:  I agree, your Honor.

21          THE COURT:  So I expect that to happen today.

22  Ma'am?

23          PRETRIAL SERVICES:  Your Honor, this is Jordan

24  Napps (phonetic) of pretrial services.  With regard to the

25  passport --

10

1          THE COURT:  Oh, I forgot that.  Thank you, yes,

2  with regard to that?

3          PRETRIAL SERVICES:  In regards to that, does

4  pretrial services have the discretion to provide the

5  Defendant's passport --

6          THE COURT:  You do.

7          PRETRIAL SERVICES:  -- after an order has been

8  filed granting her travel?

9          THE COURT:  Yes, yes, you do.  So I'm adding the

10 condition that Defendant must surrender passport to PSA,

11 Pretrial Services.  And PSA has the authority to authorize

12 international travel if necessary.  Does that satisfy what

13 I've said, ma'am?

14         PRETRIAL SERVICES:  Yes.

15         THE COURT:  Okay, great.  So those are all of the

16 basics.  Now, obviously you are under no obligation to plead

17 guilty.  You have the right to go to trial on these charges

18 or to fight it in any way you want.  What's your desire

19 today, do you want to plead guilty?

20         THE DEFENDANT:  Yes.

21         THE COURT:  Then we're going to go ahead and go

22 through that.  First, I want you to understand I am going to

23 do my very best to make it clear to you what's going on here

24 today.  If, however, at any point during this proceeding you

25 do not understand what's going on, it's up to you to let me

11

1 know.  And it's okay to interrupt me to tell me that you

2 don't understand what's going on.  If I don't hear from you

3 today, I am going to assume that you understood everything

4 that happened here today.  Do you understand that?

5            THE DEFENDANT:  Yes.

6            THE COURT:  And we're going to start your guilty

7 plea now.  I want you to listen carefully to my courtroom

8 deputy.

9            THE CLERK:  Elizabeth A. Dragon, do you now desire

10 to withdraw your former plea of not guilty to the

11 information charging you with conspiracy to commit

12 securities fraud, and to plead guilty now, ma'am, yes or no?

13            THE DEFENDANT:  Yes.

14            THE CLERK:  Ms. Dragon, how do you plead to the

15 charges against you, guilty or not guilty?

16            THE DEFENDANT:  Guilty.

17            THE CLERK:  Counsel, do you waive reading of the

18 count?

19            MR. DARMER:  Yes.

20             ELIZABETH A. DRAGON - DEFENDANT - SWORN

21            THE COURT:  How old are you, ma'am?

22            THE DEFENDANT:  I'm 61.  I'll be 62 next week.

23            THE COURT:  And how far did you in school?

24            THE DEFENDANT:  I have a Ph.D.

25            THE COURT:  All here in the United States, your

12

1  education?

2          THE DEFENDANT:  Yes.

3          THE COURT:  Do you read English fluently?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Have you taken any medication, drugs,

6  or other substance in the past 72 hours?

7          THE DEFENDANT:  I have several prescriptions for

8  asthma that I take on a routine basis, and osteoporosis

9  also.

10          THE COURT:  Okay.  Have you taken anything other

11  than those medications?

12          THE DEFENDANT:  No.

13          THE COURT:  And did you take those medications in

14  the amounts and at the intervals prescribed by a doctor?

15          THE DEFENDANT:  Yes.

16          THE COURT:  Do any of them affect your ability to

17  think or to understand what's going on here today?

18          THE DEFENDANT:  No.

19          THE COURT:  How do you feel?

20          THE DEFENDANT:  I'm fine.

21          THE COURT:  All right.  I want to remind you,

22  ma'am, you just raised your right hand agreed to tell the

23  truth and were placed under oath.  What that means is that

24  you must tell me the truth.  And if you don not tell me the

25  truth, the false answers that you give me could be used

13

1  against you and you could be charged with a totally separate

2  crime called "perjury or making a false statement."  If you

3  are convicted of that crime, you could be sentenced up to

4  five years in custody and that would be in addition to any

5  time that you receive in this case.  So it is extremely

6  important that you listen very carefully to everything I

7  have to say.  And that you think before you answer my

8  questions and that you answer my questions truthfully.  Do

9  you understand all of that?

10            THE DEFENDANT:  Yes.

11            THE COURT:  You have the right to have a district

12  judge take your guilty plea.  I am a magistrate judge.  In

13  order for me to take your guilty plea here today, you must

14  give up your right to appear in front of the district judge

15  and authorize me to go forward.  I have a two-page consent

16  document signed by you, your lawyer and the attorney for the

17  United States, in which you do that.  If that's what you

18  decide to do, it means I will take your guilty plea today

19  and another judge will sentence you at a later date.  Is

20  that what you want to do?

21            THE DEFENDANT:  Yes.

22            THE COURT:  I accept your consent.

23            I want you to listen very carefully, because by

24  pleading guilty today you are giving up some very important

25  constitutional rights.  You have all of the following

14

1  constitutional rights:  You have the right to persist in

2  your plea of not guilty.  You have the right to a speedy and

3  public trial before a jury, or you may give up that right

4  and permit a judge to try your case without a jury.  You

5  have a right to the assistance of counsel throughout all

6  proceedings including a trial.  If you cannot afford to pay

7  an attorney, appointed counsel will represent you through

8  trial at no cost to you.  You have the right to confront and

9  cross examine the witnesses against you, to testify at any

10  hearing or trial, to present evidence, and to compel

11  witnesses to attend trial on your behalf.  And you have the

12  right against compelled self-incrimination, which means that

13  you are not required to testify at any hearing or trial and

14  the Government may not comment on your silence.  Do you

15  understand that you have all of those rights?

16          THE DEFENDANT:  Yes.

17          THE COURT:  If you plead guilty today, there will

18  be no trial and you will give up all of the rights that I

19  have just told you about with the exception that your lawyer

20  will continue to represent you through sentencing.  Is that

21  what you want to do?

22          THE DEFENDANT:  Yes.

23          THE COURT:  You are pleading guilty to the crime

24  of conspiracy to commit securities fraud.  The United States

25  is required to prove every element of that crime to a jury

15

1   to a standard called "beyond a reasonable doubt."  By

2   pleading guilty you will be admitting every element, so it's

3   important that you know what they are.

4           This crime has two elements.  The first is that

5   two or more persons entered into an unlawful agreement to

6   commit at least one crime as charged in the information, and

7   that is securities fraud.

8           The second element is that you knowingly and

9   wilfully became a member of this conspiracy knowing of at

10  least one of its objects and intending to help accomplish

11  the object.  Do you understand that those are the elements

12  that the United States would have to prove and the elements

13  that you will be admitting by pleading guilty?

14          THE DEFENDANT:  Yes.

15          THE COURT:  By pleading guilty to this crime, you

16  are facing the following maximum penalties, a maximum term

17  of 25 years in prison, a maximum fine of the greatest of

18  $250,000, or twice the gross pecuniary gain derived from the

19  offense, or twice the gross pecuniary loss to a person other

20  than you as a result of the crime.  You also are facing a

21  mandatory special assessment of $100, a maximum term of

22  supervised release and there's mandatory restitution.  So

23  there will be an order from the Court that will make

24  mandatory restitution to the victims of the offense of

25  conviction, or their estates, in an amount to be determined

16

1   by the Court in accordance with federal law.  So you will be

2   required to make restitution.  The amount is unknown.  Do

3   you understand that all of those penalties constitute the

4   maximum penalty that you are facing by pleading guilty?

5           THE DEFENDANT:  Yes.

6           THE COURT:  Any forfeiture?  It's not mentioned.

7           MR. STONE:  (No audible response.)

8           THE COURT:  No.  Okay.

9           If you receive a custodial sentence, you will

10  receive a term of supervised release that will follow that

11  sentence.  That means that when you are released from

12  custody you will have to comply with the terms and

13  conditions imposed by the sentencing judge.  If at any point

14  during the period of supervised release you are found to

15  have violated your conditions of supervised release, you

16  could be returned to prison for the full amount of the

17  supervised release term and you would not receive credit for

18  the time you already served in custody on the original

19  offense.  Do you understand that?

20          THE DEFENDANT:  Yes.

21          THE COURT:  Are you a United States citizen?

22          THE DEFENDANT:  Yes.

23          THE COURT:  The sentencing judge in this case will

24  consider the sentencing guidelines as advisory in

25  determining your sentence.  Have you discussed with your

17

1   attorney the sentencing guidelines and how they may apply to

2   you?

3            THE DEFENDANT:  Yes.

4            THE COURT:  The sentencing guidelines are not

5   mandatory.  So the sentencing judge may depart from them and

6   sentence you all the way up to the statutory maximum.  Do

7   you understand that?

8            THE DEFENDANT:  Yes.

9            THE COURT:  Neither your attorney, nor anybody

10  else, can guarantee the sentence that you will receive.  If

11  the sentence you receive is more severe than you expect, you

12  will still be bound by your guilty plea and you will not

13  have a right to withdraw your guilty plea.  Do you

14  understand that?

15           THE DEFENDANT:  Yes.

16           THE COURT:  I have in front of me a written plea

17  agreement and we're going to go through that now.  I'm

18  showing you the last page of a 15-page plea agreement.

19  There are four signatures.  Is the bottom one yours?

20           THE DEFENDANT:  Yes.

21           THE COURT:  Before you signed this document, did

22  you read the entire document?

23           THE DEFENDANT:  Yes.

24           THE COURT:  Did you have enough time to discuss it

25  with your lawyer?

18

1          THE DEFENDANT:  Yes.

2          THE COURT:  Did he explain this agreement to you

3    and answer any questions you may have had?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Are you satisfied with the

6    representation that you've received from your lawyer?

7          THE DEFENDANT:  Yes.

8          THE COURT:  By placing your signature on the last

9    page then, did that signify that you read the entire

10   document, that you understood the entire document, and that

11   you agree to be bound by all of the terms and conditions set

12   forth in the document?

13         THE DEFENDANT:  Yes.

14         THE COURT:  Your plea agreement contains a

15   provision entitled "Defendant waives appeal and collateral

16   attack."  Did you discuss that provision with your lawyer?

17         THE DEFENDANT:  Yes.

18         THE COURT:  In this document you waive to the full

19   extent of the law any right to appeal or to collaterally

20   attack the conviction and sentence including any restitution

21   order unless the Court imposes a custodial sentence greater

22   than the high end of the guideline range recommended by the

23   Government pursuant to this plea agreement at the time of

24   sentencing.  Do you understand that provision?

25         THE DEFENDANT:  Yes.

19

1           THE COURT:  And do you agree to be bound by it?

2           THE DEFENDANT:  Yes.

3           THE COURT:  Mr. Darmer, have you discussed this

4  plea agreement thoroughly with your client including the

5  provision regarding waiver of appeal and collateral attack?

6           MR. DARMER:  Yes.

7           THE COURT:  And in your opinion does she

8  understand the plea agreement in its entirety?

9           MR. DARMER:  Yes.

10           THE COURT:  Ms. Dragon, returning to you.  Your

11  written plea agreement contains certain promises.  Have any

12  other promises been made to you by anybody in order to get

13  you to plead guilty?

14           THE DEFENDANT:  No.

15           THE COURT:  Has anyone threatened you or forced

16  you to plead guilty?

17           THE DEFENDANT:  No.

18           THE COURT:  Are you pleading guilty to help any

19  person other than yourself?

20           THE DEFENDANT:  No.

21           THE COURT:  Is it true then that you are pleading

22  guilty because you are guilty and for no other reason?

23           THE DEFENDANT:  Yes.

24           THE COURT:  I'm now going to talk with you about

25  what it is that you did that makes you guilty of this crime.

20

1   I want to remind you that you are under oath, so you must

2   tell me the truth.  Does the United States want to state the

3   factual basis, or do you want me to go through facts as set

4   forth in the plea agreement?

5           MR. STONE:  Your Honor, if you would like to do

6   that, there's no objection from us.

7           THE COURT:  Okay, great.  I have the original plea

8   agreement obviously in front of me.  And you graciously

9   provided me with a copy ahead of time, which I've reviewed.

10  Are there any changes from the one I reviewed ahead of time?

11          MR. STONE:  No, your Honor.

12          THE COURT:  All right, ma'am, I am going to go

13  through the plea agreement.  It looks like you have it in

14  front of you and I'm starting on page two.  How do you say

15  the name of that company?

16          THE DEFENDANT:  Sequeno (phonetic).

17          THE COURT:  Sequeno.  All right.  So, is Sequeno a

18  biotechnology company headquartered in San Diego with shares

19  of common stock registered withe the U.S. Securities and

20  Exchange Commission and publically traded under the ticker

21  symbol SQNM on the NASDAQ?

22          THE DEFENDANT:  Yes.

23          THE COURT:  And did you work for that company as

24  senior vice president for research and development from May

25  15th of 2006 until September 28th of 2009?

21

1          THE DEFENDANT:  Yes.

2          THE COURT:  And did the company publicize its

3  performance through a variety and means including press

4  releases, conference calls, meetings with investors and

5  security analysts, scientific conferences and filings with

6  the SEC?

7          THE DEFENDANT:  Yes.

8          THE COURT:  As senior vice president, did you have

9  responsibility for research and development -- for the

10 research and development department?

11         THE DEFENDANT:  Yes.

12         THE COURT:  In addition to your supervisory

13 responsibilities, did you personally participate in the

14 dissemination of information about Sequeno -- say it again.

15         THE DEFENDANT:  Sequeno.

16         THE COURT:  -- so participate in the dissemination

17 of information about Sequeno to the public including to

18 security analysts, investors and others?

19         THE DEFENDANT:  Yes.

20         THE COURT:  And during your last two years with

21 them, did you earn over $500,000 in salary and bonus?

22         THE DEFENDANT:  Yes.

23         THE COURT:  Did you also receive over 240,000

24 options to purchase Sequeno stock?

25         THE DEFENDANT:  Yes.

22

1           THE COURT:  And did all of these options remain

2    unexercised at the time of your termination in September of

3    2009?

4           THE DEFENDANT:  Yes.

5           THE COURT:  Did Sequeno's business include the

6    design and marketing of molecular diagnostic testing and

7    genetic analysis for a variety of purposes including

8    biomedical research?

9           THE DEFENDANT:  Yes.

10          THE COURT:  And were you aware during the time

11   that you worked with them, that Sequeno's share price was

12   impacted by whether its tests were determined to be reliable

13   and accurate predictors for a large segment of the

14   population?

15          THE DEFENDANT:  Yes.

16          THE COURT:  And in that regard, did you know that

17   it was material to investors and analysts to know whether

18   Sequeno's evaluation of its technology was performed in

19   blinded tests, that is whether the scientists conducting the

20   tests were blind to the actual outcomes, and whether the

21   number of samples and detection rates were accurately

22   reported?

23          THE DEFENDANT:  Yes.

24          THE COURT:  And did you again know at the time

25   that the more reliable and accurate its tests, and the

23

1  greater number of people who could be evaluated using its

2  tests, the more likely that Sequeno's revenues would

3  increase and therefore its stock price would appreciate?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Beginning in approximately 2008, did

6  Sequeno announce that it was developing an innovative

7  genetic screening test to detect down syndrome in a fetus

8  using its proprietary SEQ --

9          THE DEFENDANT:  Security X.

10         THE COURT:  Security X technology?

11         THE DEFENDANT:  Yes.

12         THE COURT:  And is it true -- actually, let me ask

13 it this way, did you know that Sequeno described the

14 reliability and accuracy of that test by reference to

15 several measures including specificity and sensitivity?

16         THE DEFENDANT:  Yes.

17         THE COURT:  And you know what those provisions

18 mean?

19         THE DEFENDANT:  Yes.

20         THE COURT:  And they mean what's set forth in the

21 plea agreement, is that correct?

22         THE DEFENDANT:  That is correct.

23         THE COURT:  And by September of 2008, did you know

24 that Sequeno was claiming that the down syndrome test had

25 the ability to accurately detect a positive down syndrome

24

1    sample as early as the first trimester of pregnancy?

2            THE DEFENDANT:  Yes.

3            THE COURT:  Starting in early of 2008 and

4    continuing until at least April 2009, did you knowingly and

5    wilfully agree with others to defraud Sequeno's shareholders

6    by disseminating false material information about the

7    performance of the down syndrome test?

8            THE COURT:  Yes.

9            THE DEFENDANT:  Specifically, did that false and

10   misleading information include, one, false claims that

11   Sequeno's tests were blinded.  Second, false claims about

12   the number of samples that were actually tested.  Third,

13   false claims about the actual no-call rates experienced

14   during the tests.  And, four, false claims about the

15   sensitivity and specificity percentages associated with the

16   test results?

17           THE DEFENDANT:  Yes.

18           THE COURT:  And during that time these actions

19   were undertaken with the intent to defraud the shareholders

20   and others as they were designed to falsely portray the down

21   syndrome test underdeveloped as more accurate and more

22   reliable than was actually the case, which would thereby

23   inflate and sustain the price of Sequeno's stock.  Did you

24   know all of that?

25           THE DEFENDANT:  Yes.

25

1          THE COURT:  Beginning on June 4th of 2008 -- no,

2    on two dates -- June 4th of 2008 and September 23rd or 2008,

3    did you know that Sequeno issued public statements from its

4    headquarters in San Diego reporting positive data from

5    studies evaluating its down syndrome test?

6          THE DEFENDANT: Yes.

7          THE COURT:  Did you also know that they reported

8    that the studies were blinded studies and that its tests had

9    a hundred percent sensitivity and a hundred percent

10   specificity?

11         THE DEFENDANT:  Yes.

12         THE COURT:  And did you also know that they

13   claimed that the testing involved hundreds of samples and

14   that only a small percentage of the samples could not be

15   interpreted using the test?

16         THE DEFENDANT:  Yes.

17         THE COURT:  Did you and your co-conspirators

18   participate in the drafting of these public statements?

19         THE DEFENDANT:  Yes.

20         THE COURT:  Did you personally present these test

21   results at a conference and investor meeting in Vancouver,

22   Canada on June 3rd of 2008?

23         THE DEFENDANT:  Yes.

24         THE COURT:  Did you also personally participate in

25   a briefing with securities, analysts and investors in New

26

1  York on September 23rd of 2008?

2          THE DEFENDANT:  Yes.

3          THE COURT:  And a result of the presentation of

4  this positive data, did Sequeno's stock price dramatically

5  increase from approximately $8.00 per share to just over

6  $25.00 per share on January 21st of 2009?

7          THE DEFENDANT:  Yes.

8          THE COURT:  At the time that you made these

9  statements -- you and your co-conspirators made these

10 statements, did you know that they were materially false and

11 misleading?

12         THE DEFENDANT:  Yes.

13         THE COURT:  Specifically, did you know that the

14 tests were not blinded because the scientists who were

15 conducting the test knew the true outcomes?

16         THE DEFENDANT:  yes.

17         THE COURT:  Did you also -- or had you also

18 personally notified the scientists that their initial test

19 results contained false positives and false negatives?

20         THE DEFENDANT:  Yes.

21         THE COURT:  And did you and your co-conspirators

22 cause the initial results to be changed so that the reported

23 results matched the samples true outcomes?

24         THE DEFENDANT:  Yes.

25         THE COURT:  And did you know at the time that the

27

1 number of samples actually tested was significantly lower

2 than reported to the public?

3            THE DEFENDANT:  Yes.

4            THE COURT:  Did you also know that the down

5 syndrome's test no-call rates, that is the percentage of

6 samples for which the tests could not determine whether they

7 were positive or negative for down syndrome, was higher than

8 actually reported?

9            THE DEFENDANT:  Yes.

10            THE COURT:  On January 28 of 2009 and February 3rd

11 of 2009, did you know that Sequeno issued public statements

12 from its headquarters in San Diego reporting additional

13 positive data from the studies, and again claiming that the

14 studies were blinded?

15            THE DEFENDANT:  Yes.

16            THE COURT:  And did you know that that information

17 was false and misleading?

18            THE DEFENDANT:  Yes.

19            THE COURT:  Did you also know that Sequeno claimed

20 that the down syndrome's test performance had a hundred

21 percent sensitivity and greater than 99 percent specificity

22 even though the results contained a false positive and a

23 higher no-call rate?

24            THE DEFENDANT:  Yes.

25            THE COURT:  Did you also know that Sequeno falsely

28

1 claimed that the down syndrome test was on track for a

2 commercial launch by June 2009?

3          THE DEFENDANT:  Yes.

4          THE COURT:  On February 4th of 2009 after the

5 release of these results, including the correction of an

6 apparent error in the published no-call rate, did Sequeno's

7 stock close at approximately $17.00 per share?

8          THE DEFENDANT:  Yes.

9          THE COURT:  And did you personally participate,

10 along with your co-conspirators, in the drafting of these

11 materially false and misleading statements?

12          THE DEFENDANT:  Yes.

13          THE COURT:  And did you personally know they were

14 false because, one, the tests were not blinded.  Two, the

15 number of samples tested was actually lower than the number

16 reported.  And, three, the no-call sensitivity and

17 specificity rates were all inaccurate?

18          THE DEFENDANT:  Yes.

19          THE COURT:  During a presentation to security

20 analysts and investors in San Diego, California on January

21 28th of 2009, did you personally misrepresent that the tests

22 were blinded and repeated the false no-call specificity and

23 sensitivity rates?

24          THE DEFENDANT:  Yes.

25          THE COURT:  On April 29th of 2009, did you know

29

1 that Sequeno issued a press release announcing a substantial

2 delay in the further testing and commercial release of the

3 down syndrome test?

4          THE DEFENDANT:  Yes.

5          THE COURT:  In that release, did the company

6 contend that employee mishandling of R and D test data and

7 results rendered the previously released results unreliable

8 and they announced an internal investigation?

9          THE DEFENDANT:  Yes.

10          THE COURT:  Also on that date did Sequeno issue a

11 press release announcing its financial results for the

12 quarter ending March 31 of 2009?

13          THE DEFENDANT:  Yes.

14          THE COURT:  On April 30th of 2009, did Sequeno's

15 stock price decline from the previous day's close of 14.91

16 to less than $4.00 per share?

17          THE DEFENDANT:  Yes.

18          THE COURT:  And did that reduce its market

19 capitalization by approximately $700,000,000?

20          THE DEFENDANT:  Yes.

21          THE COURT:  Is the United States satisfied with

22 the factual basis?

23          MR. STONE:  Yes, thank you, your Honor.

24          THE COURT:  And, Mr. Darmer, is this plea made

25 voluntarily and with your concurrence?

30

1          MR. DARMER:  Yes, it is.

2          THE COURT:  Speaking with you again, Ms. Dragon,

3  understanding the maximum penalties that you are facing, the

4  rights that you have and are giving up, and all of the other

5  consequences of your guilty plea, do you still want to plead

6  guilty?

7          THE DEFENDANT:  Yes.

8          THE COURT:  How do you plead to the one count

9  information charging you with conspiracy to securities

10 fraud?

11         THE DEFENDANT:  Guilty.

12         THE COURT:  Based upon everything that has

13 happened here in court today, as well as all of the written

14 documents in front of me, I find that your guilty plea is

15 made knowingly and voluntarily with a full understanding of

16 the nature of the charge, the rights that you have and are

17 giving up, and all of the other consequences of your guilty

18 plea.  I also find that there is a factual basis for your

19 guilty plea, and I therefore recommend to the district judge

20 in this case that he accept your guilty plea.  And I'm going

21 to set this for sentencing in front of the district judge.

22 So you are ordered, ma'am, to appear in Judge Hayes'

23 courtroom on August 30th at 9:00 a.m.  Do you understand

24 that you must appear in Judge Hayes' courtroom on August

25 30th at 9:00 a.m.?

31

1          THE DEFENDANT:  Yes.

2          THE COURT:  I find that the time between today and

3   the sentencing hearing date is excludable under the Speedy

4   Trial Act on the grounds that the district judge will be

5   considering the proposed plea agreement.  I hereby vacate

6   all hearing dates -- but there aren't any hearing dates --

7   and I order probation to prepare a presentence report in

8   this case.  Anything else, counsel for the Government?

9          MR. STONE:  Nothing from the Government, your

10  Honor.

11         THE COURT:  Mr. Darmer?

12         MR. DARMER:  Nothing from the Defendant.

13         THE COURT:  That's it then for today.  I want to

14  remind you, you have to go downstairs and be booked and then

15  you must appear in Judge Hayes' courtroom on August 30th at

16  9:00 a.m.  That's it.  Good luck to you, ma'am.

17         THE DEFENDANT:  Thank you.

18         MR. STONE:  Thank you, your Honor.

19         MR. DARMER:  Thank you, your Honor.

20         THE COURT:  You're welcome.

21

22

23

24

25

32

1          I certify that the foregoing is a correct

2  transcript from the electronic sound recording of the

3  proceedings in the above-entitled matter.

4  /s/L.L. Francisco          6/3/10
   Transcriber                Date

5

6  FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

7  /s/L.L. Francisco
   L. L. Francisco, President
8  Echo Reporting, Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25